YI LIN ZHENG, ESQ.
Nevada Bar No. 10811
VEGAS GOLDEN LAW
500 Rose Street
Las Vegas, NV 89102
Phone (702) 385-7170
Email: vegasgoldenlaw@gmail.com
Attorney for Defendant
Brandon Kelly Dillard

**UNITED STATES DISTRICT COURT**

**DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATE OF AMERICA, | Case No. 1:23-cr-00076-CRC |
| Plaintiff, | **SENTENCING MEMORANDUM** |
| v. | |
| BRANDON KELLY DILLARD, | |
| Defendant. | |

Yi Lin Zheng, counsel for defendant Brandon Kelly Dillard, hereby files this sentencing memorandum.  Mr. Dillard respectfully requests a sentence of time served followed by a term of supervised release with conditions the Court deems appropriate as sufficient, but not greater than necessary to achieve the goals of sentencing.

**I.     THE COURT SHOULD APPLY THE TWO-LEVEL, ZERO-POINT OFFENDER REDUCTION.**

Under U.S.S.G. § 4C1.1 ("Adjustment for Certain Zero-Point Offenders"), a defendant may receive a two-level reduction to his offense level if he meets ten enumerated criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under § 3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

1

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense:

(8) the instant offense of conviction is not covered by § 2H1.1 (Offenses Involving Individual Rights)

(9) the defendant did not receive an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense);

(10) the defendant did not receive an aggravating adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848.

"Put differently, to qualify, a defendant must have zero criminal history points and certain aggravating factors must not be present." *United States v. Yang*, 23-cr-100, 2024 U.S. Dist. LEXIS 22938 * 8 (D.D.C. Feb. 9, 2024).

Like in *Yang*, the only criterion at issue here is the third: "the defendant did not use violence or credible threats of violence or credible threats of violence in connection with the offense." The PSR cites, without explanation, the third criterion in recommending that Mr. Dillard not receive the two-level, zero-point offender reduction. Mr. Dillard believes the government will argue that his actions on January 6 were violent. Mr. Dillard also anticipates that the government will argue, in the alternative, that his mere presence in the January 6 riot should constitute a "use of violence" sufficient to disqualify him from receiving the reduction. The *Yang* court rejected generalized argument regarding participating in the January 6 riot qualified as violent conduct and rejected the defendant-specific argument on facts like the facts in this case. This Court should also reject the government's arguments that Mr. Dillard used violence and reduce his offense level two level under § 4C1.1.

/// /// ///

/// /// ///

**A.     Mr. Dillard's Specific Conduct Did Not Have the Requisite Intent to Harm or Degree of Aggression.**

"Contemporary dictionaries define 'violence' as '[t]he use of physical force, usu[ally] accompanied by fury, vehemence, or outrage; esp[ecially], physical force unlawfully exercised with the intent to harm or as the use of physical force so as to injure, abuse, damage, or destroy.'" *Yang*, 2024 U.S. Dist. LEXIS 22938 * 8.  Cases that have defined "violence" in similar contexts have focused on physical force combined with an "intent to injure." *Id.* (citing *United States v. Pineda-Durate*, 933 F.3d 519, 523 (6th Cir. 2019)).

In *Yang*, the defendant "briefly grabbed an officer's wrist" and "briefly grabbed [an officer's] baton" while he was in front of a line of police officers in the Rotunda. *Yang*, 2024 U.S. Dist. LEXIS 22938 at *3.  The court characterized the defendant's actions as "brief and reactive." *Id.*  The court further found that the defendant's actions were not made "with an intent to harm" and "did not act with the degree of aggression necessary to fairly characterize his actions as 'violence.'" *Id.*

Here, Mr. Dillard's contact with Officer B.M. was similarly "brief and reactive," was not made with an intent to harm, and cannot be fairly characterized as violent.  In the video clip of Mr. Dillard's conduct, Mr. Dillard was part of a group near Officer B.M. as the officer made his way from the tunnel to a handicap elevator near the stairs.  Immediately before Mr. Dillard first contacts the officer's helmet, someone can clearly be heard saying "he [referring to the officer] can't breathe."  Mr. Dillard appears to echo the sentiment before contacting the officer's helmet.  Mr. Dillard's second contact pushed the helmet forward.  Neither move was aggressive or made with an intent to harm the officer or claim his helmet as a souvenir.  In his own words, Mr. Dillard explains:

> I saw the police officer being dragged and tossed around by many people, some trying to help, some trying to do harm. I saw him struggling to breathe with the gas mask on. His face bright red and his clear shield was foggy. At that moment, all I could think is someone needs to help him before he passes out from asphyxiation. His body was going limp while they were moving him. I made a split-second decision to go and try to help. I didn't want anyone else getting hurt. I know how difficult it was to breathe in those, as my dad had one from when he worked as an officer. In a desperate attempt to get through the crowd, while screaming, trying to communicate with the group of people closest to

3

him, I said, 'He can't f**king breathe.' There was a brief point when I tried speaking directly to the officer, to tell him I was trying to help him breathe. Unfortunately, because of the crowd, I wasn't able to get close enough for long enough to meaningfully help. I've been honest about everything that happened that day. I have nothing to hide and want to be accountable for my actions.

Mr. Dillard's intent was to help the officer breathe. Right before Mr. Dillard makes contact, someone else can be heard announcing it to the crowd. The parts of the officer's face that are visible appear red and flushed. From Mr. Dillard's experience having had a father who was in law enforcement, he wanted to help the officer by removing his helmet and gas mask so that the officer could breathe normally. Mr. Dillard's actions lacked the requisite intent to harm or degree of aggressiveness to characterize his actions as violent.

**B.    The Court Should Not Impute the Violence Perpetrated by Other Rioters on to Mr. Dillard.**

The "inherently individualized" nature of § 4C1.1 and the plain text of § 4C1.1(a)(3) focus the analysis on Mr. Dillard's actions rather than the actions of others. *Yang*, 2024 U.S. Dist. LEXIS 22938 * 11. "The plain reading is reinforced by the contrast with the language of the very next provision, which requires that 'the offense did not result in death or serious bodily injury.'" *Id.* at 12 (emphasis in original). This Court should join *Yang* and at least six other judges in this district and reject the government's "violence-by-presence-theory." *Id.* (collecting cases).

**II.    THE COURT SHOULD NOT APPLY THE THREE-LEVEL ENHANCEMENT FOR MAKING PHYSICAL CONTACT WITH OFFICER B.M.**

In his plea agreement, Mr. Dillard reserved the right to challenge the application of the three-level, physical contact enhancement under U.S.S.G. § 2A2.4. Neither § 2A2.4 nor its application notes and commentary define the term "physical contact." The enhancement:

> [F]ocuses on the nature of the conduct comprising the offense of resisting … [and] takes into account not only the threat to the safety of the officers which may be posed by physical contact or the use of a deadly weapon, but also the added impediment to the execution of official duties which may be posed by physical contact.

*United States v. Beckner*, 983 F.2d 1380, 1388 (6th Cir. 1993) (Graham, J., dissenting).

Courts that have addressed this enhancement have held defendant, but not victim, initiated contact will satisfy the requirement. *United States v. McKeiver*, 982 F. Supp. 842, 845-46 (M.D. Fl. 1997) (collecting cases). One circuit court defined "physical contact" by referring to the definition of battery. *United States v. Taliaferro*, 211 F.3d 412, 415 (7th Cir. 2000) ("[B]attery is defined as 'intentional and wrongful physical contact with a person'").

No federal court has directly addressed if the enhancement applies when the defendant made physical contact to aid the officer. Almost all the cases involving § 2A2.4 arose from a defendant attempting to escape from law enforcement. *United States v. Stevenson*, No. 20-3207/3208 (6th Cir. 2020) (defendant attempted to flee from officers in a car and resisted their efforts to physically remove him); *United States v. Williams*, 23 F.3d 404 (4th Cir. 1994) (defendant scuffled with corrections officers attempting to restrain him); *United States v. Hill*, 996 F.2d 1228 (9th Cir. 1993) (defendant resisted corrections officers attempting to seize contraband from his cell); *United States v. Wollenzien*, 972 F.2d 890, 891 (8th Cir. 1992) (defendant hit an IRS agent in the neck); *United States v. Collins*, 937 F.2d 617 (10th Cir. 1991) (defendant attempted to escape from the emergency exit of an inmate transport plane and violently struggled with marshals attempted to prevent his escape). The common element in these cases is that the defendant acted aggressively and with a degree of force beyond that which was necessary to obstruct the officers.[1]

---

[1] Mr. Dillard notes that in *Yang*, the defendant agreed to the application of the three-level, physical contact enhancement and that court appeared to agree that Yang's conduct satisfied the enhancement. 2024 U.S. Dist. LEXIS 22938 at *11. In *Yang*, the defendant was at the front of a crowd confronting a line of police officers in the Rotunda. He remained at the front of the crowd and did not leave even after the line of officers began to advance. Despite his non-threatening, non-confrontational demeanor, the defendant's presence opposite a line of police officers deep inside the Capitol led to him grabbing an officer's wrist and another officer's baton. Here, Mr. Dillard was outside the Capitol, tried to help Officer B.M., and acted after he noticed the officer couldn't breathe, as someone else concurrently yelled out. For those reasons, *Yang*, in so far as its facts support the three-level, physical contact enhancement, is distinguishable.

5

When focusing on the nature of Mr. Dillard's conduct and its "threat to the safety of officers" and the "added impediment to the execution of official duties," Mr. Dillard's conduct does not rise to a level sufficient to trigger the enhancement. The conduct was not a threat to Officer B.M.'s safety nor was it wrongful, Mr. Dillard was trying to help the officer remove his helmet and gas mask to breathe. The conduct also did not further impede Officer B.M. in protecting the Capitol. Rioters had removed the officer from the tunnel. Officer B.M. was making his way through the crowd to get to safety. When Mr. Dillard came into the picture, he and several others around him were concerned for the officer's personal safety and acted accordingly. The Court should not apply the three-level physical contact enhancement.

### III. JANUARY 6 DEFENDANTS WHO ARE SIMILARLY SITUATED TO MR. DILLARD HAVE RECEIVED NONCUSTODIAL SENTENCES.

In the three years since January 6, courts have sentenced hundreds of January 6 defendants. Among those defendants with similar charges to Mr. Dillard, many acted more egregiously than Mr. Dillard and still received non-custodial sentences. These individuals either incited others to breach the Capitol or made it farther into the building:

1. *United States v. Yang* (23-cr-100-JDB): Mr. Yang pled guilty to one count of civil disorder in violation of 18 U.S.C. § 231(a)(3). Mr. Yang remained in the Capitol for approximately 30 minutes, stood near the front of a crowd confronting a line of police officers in the Rotunda, and twice grabbed an officers' person or equipment. According to his plea agreement, Mr. Yang's advisory guideline range was the same as Mr. Dillard's. The government requested an 11-month term of imprisonment. The Court sentenced Mr. Yang to 24 months probation.

2. *United States v. Epps* (23-cr-321-JEB): Mr. Epps pled guilty to one count of disorderly or disruptive conduct in a restricted area in violation of 18 U.S.C. § 1752(a)(2). Mr. Epps was at the front of a crowd that overwhelmed police at three key breach points, helped push a large metal-framed sign against a group of police officer, and participated in a rugby-style scrum to push past the same group of officers. Despite his conduct, Mr. Epps allegedly tried to deescalate conflict between rioters and police officers and helped the FBI and Congress after his initial arrest. The latter action made Mr. Epps the center of an oft-repeated

conspiracy theory that he was a government agent.[2] At sentencing, the government requested a 6-month term of imprisonment. The Court sentenced Mr. Epps to 12 months probation.

3. *United States v. Billingsley* (21-cr-519-TFH): Mr. Billingsley pled guilty to one count of disorderly or disruptive conduct in a restricted area in violation of 18 U.S.C. § 1752(a)(2). Mr. Billingsley posted numerous videos to social media threating physical harm to members of Congress, encouraged others to breach the Capitol, helped at least one other person move a barricade, and encouraged rioters to push past lines of police officers. The government requested a 6-month term of imprisonment. The Court sentenced him to 24 months probation.

4. *United States v. Marquez* (21-cr-136-RC): Mr. Marquez pled guilty to one count of disorderly or disruptive conduct in a restricted area in violation of 18 U.S.C. § 1752(a)(2). Mr. Marquez encouraged others to climb the walls into the Capitol, was part of a mob that pushed past a line of officers trying to hold back the crowd, entered and damaged a Senator's office, and bragged about his conduct on social media. The government requested a four-month term of imprisonment. The Court sentenced him to 18 months of probation with three months of home confinement.

5. *United States v. Aryes* (21-cr-156-JDB): Mr. Aryes pled guilty to one count of disorderly or disruptive conduct in a restricted area in violation of 18 U.S.C. § 1752(a)(2). Mr. Ayres was part of a crowd that breached the Capitol through the Senate Wing Doors and remained inside for at least 10 minutes. The government requested a sentence of imprisonment. The Court sentenced Aryes to 24 months probation.

6. *United States v. Boulton* (23-cr-284): Mr. Boulton pled guilty to one count of entering or remaining in a restricted area in violation of 18 U.S.C. § 1752(a)(1). Mr. Boulton remained inside the Capitol for approximately 15 minutes. While inside, he filmed himself and later uploaded the videos to social media, boasting about his conduct. The government requested a sentence of imprisonment. The Court sentenced Mr. Boulton to 24 months probation.

When compared to other, similarly situated defendants, Mr. Dillard's conduct does not warrant a custodial sentence. Mr. Dillard entered the Capitol through an already broken window, following others who had already made it in. He spent about 30 seconds inside an empty office

---

[2] While Mr. Dillard was never the target of a conspiracy theory repeated by a national media outlet, he was part of a Late Show with Stephen Colbert monologue mocking his unofficial nickname "Spider-Nazi" and his actions at the Capitol. Tucker's Transparent Jan 6th Propaganda, Feds Nab Spider-Nazi, Kari Lake May be T****'s VP Pick, The Late Show with Stephen Colbert at 6:48-7:48, https://www.youtube.com/watch?v=6cBNXGryZww, last accessed February 19, 2024.

inside the Capitol. PSR ¶22. He did not wander around the Capitol for 30 minutes and confront a line of police officers in the Rotunda like Yang. He did not encourage others to enter the Capitol or damage property inside a Senator's office like Marquez. He was not part of a crowd that removed barricades, pushed past officers, or actively tried to breach the Capitol like Billingsley and Epps.

Mr. Dillard's actions towards Officer B.M. were motivated by a desire to help. Like Epps's attempts to deescalate violence between rioters and officers, Mr. Dillard's attempts to help the officer remove his helmet and gas mask were done with the officer's personal well-being in mind and did not advance the purpose of the riot or further the ensuing destruction. If defendants who actively pushed past officers, removed barricades, and destroyed property received non-custodial sentences, Mr. Dillard, who briefly touched an officer's helmet, should receive one as well.

**IV.   THE MITIGATING CHARACTERISTICS OF MR. DILLARD, BASED ON 18 U.S.C. § 3553(a) FACTORS, CALL FOR A TIME-SERVED SENTENCE WITH A TERM OF SUPERVISED RELEASE AS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE SENTENCING PURPOSES.**

Brandon Kelly Dillard was born and raised in Las Vegas, Nevada. Although he has two paternal half siblings, he was the only child born to the marriage of his parents, Susan Schneider and Dennis Dillard, Sr. His parents divorced when Mr. Dillard was one-year-old. However, they eventually became good friends and were able to successfully co-parent together. Mr. Dillard split his time between his parents, both of which provided him with a stable household and provided for all of his basic needs. He enjoyed a close-knit extended family growing up with both sets of grandparents, aunts and uncles, spending many holidays together. PSR ¶51.

Mr. Dillard's mother, Susan, eventually got remarried to David Schneider. They have been married for 30+ years. Mr. Dillard enjoys a good relationship with his mother and stepfather. Mrs. Schneider is a small business owner. She owns and operates Vegas Girl Wigs. The business provides products and services to help people suffering with cancer and/or hair loss to feel better about themselves and how they look. Mr. Dillard has always helped around the shop growing up.

8

When he moved away for college, he would work at a marketplace selling hair products from the family business. When Mr. Dillard moved back to Las Vegas he began to work at Vegas Girl Wigs full time. Over the last 10+ years he has helped to grow the business she created. He has also gradually taken over the management responsibilities and the day-to-day operations from his mother. Mrs. Schnieder relies heavily on Mr. Dillard to keep the family business operating. PSR ¶53.

Mr. Dillard's father, Dennis, was initially in the hospitality industry. But when Mr. Dillard was a teenager, his father made a significant career change and started a new career in law enforcement working with the Bureau of Prisons (BOP), where Mr. Dillard's uncle was also an officer. His father then became a corrections officer at the North Las Vegas Jail, where he remained for 15 years until his retirement. Over his years in law enforcement Mr. Dillard's father received multiple commendations, he became a BOP K-9 trainer, received multiple FBI certifications, became a member of the Sheriff's Emergency Response Team (SERT), assisted with multiple Special Weapons and Tactics (SWAT) unit operations, and worked as a bailiff for a judge. Mr. Dillard and his father bonded over the career change. His father often shared stories about accomplishments and challenges, new training techniques, how to care for special equipment and shining his boots. This bond continued throughout his father's career. Following his dad's retirement and in later years, their bond and discussions shifted to politics. His father passed away in 2019, naming Mr. Dillard as the executor of his trust and estate. Mr. Dillard faithfully carried out those duties and took over the care of the animals that his father looked after. PSR ¶54.

Growing up, Mr. Dillard attended private Catholic school for most of K-12 education. He participated in running track and field, playing soccer, skateboarding and snowboarding. While Mr. Dillard maintained good grades, he struggled to stay on task with schoolwork because of difficulties staying focused related to his ADHD. He was not officially diagnosed until high school, after a series of impulse control and attention deficit issues developed into disciplinary problems. Since then, Mr.

Dillard has worked hard to address his ADHD under the guidance of physicians and with the help of medication. He graduated from Bonanza High School. PSR ¶66, 77

In 2002, Mr. Dillard suffered a serious car accident that totaled both cars involved. The injuries to his neck and lower back necessitated physical therapy for two years, pain management physicians, and prescription pain medications. Mr. Dillard persevered to go on to attend college. He spent two years at San Diego Mesa College, where he did well, maintained good grades, and was given the opportunity to transfer to San Diego State College. He was pursuing a degree in business administration and was one semester shy of graduating, when he got into a second car accident which exacerbated the prior injuries and caused additional medical issues. Mr. Dillard decided to move back to Las Vegas to facilitate his recovery, to be with his girlfriend, and start working full-time at the family business. PSR ¶78-79, 64.

In 2013, Mr. Dillard suffered a loss that sent him on a downward spiral. His girlfriend of six years, Sarah Wika, died due to an overdose. Mr. Dillard found her dead in their shared home. She had struggled with alcohol and benzodiazepine abuse, as well as depression. In response, Mr. Dillard began to abuse his prescription pills and other drugs to dull the pain. It was two years before he was ready to climb out of the hole caused by losing Ms. Wika. Mr. Dillard made the decision to change his life, move forward, heal, and to be healthy and sober from all substances. He found support and community in attending Alcoholics Anonymous and Narcotics Anonymous meetings. PSR ¶61, 74.

As part of his healing process, Mr. Dillard found new friends with healthy lifestyles. He committed to spending more time with family, especially his father Dennis. After every work week, they would have dinner together and invariably they would converse about politics. Mr. Dillard took up politics, like a hobby, keeping up with the daily news, doing further reading, and discussing it with his dad. In 2017, he began dating his current girlfriend Blaize Mettler. He purchased a home, which they now share. He worked to improve himself. He became more involved with the non-profit organizations, animal sanctuaries and rescues that he has supported from a young age. PSR ¶60

In traveling to Washington D.C., it was never Mr. Dillard's intent to participate in any kind of attack or to riot. It was meant to be a trip to see the former president speak, to see the monuments, visit the Smithsonian, and to dine at some nice restaurants. Heading over to the U.S. Capitol was an impulsive decision. Following the former President's speech at the Ellipse, Mr. Dillard and his girlfriend were dining at a restaurant and overheard that people were heading over to the Capitol. He was not fully aware of what was unfolding there. Nevertheless, his decisions to make his way onto restricted areas of the Capitol grounds, to remain and move about, to scale down an exterior wall, to climb through a hollowed-out window, and to act in a manner that could put a MPD officer in further apprehension of danger are all wrong and disallowed. While those actions reflect a series of compounding poor decisions, it is not an accurate reflection of Mr. Dillard's true character. Immediately after it happened, Mr. Dillard knew what he did was wrong. He is deeply ashamed of his participation in the events of January 6 and the stain that it cast on this nation's history and on himself. He has never wavered on this.

Mr. Dillard sought out present counsel early on in an attempt to cooperate with the investigation. Mr. Dillard directed counsel to make contact with the authorities. Contact was made on several occasions. However, there were changes in special agents handling the case. Before a sit down could be fully arranged, Mr. Dillard was arrested. On March 3, 2023, late in the morning on a Friday, just after the cut off time for a same-day initial appearance, he was arrested at his work. Mr. Dillard spent three days in jail until he was seen by the court and ordered released on a personal recognizance bond. PSR p.2. To date, he has complied with all court-ordered conditions of release. PSR ¶10. Including drug testing with all negative results, drug evaluation, and six months of substance abuse counseling. Exhibit J. Mr. Dillard was open, honest, and contrite during his debrief, on February 28, 2024, with the FBI and AUSAs regarding the events in and around January 6 including his actions and involvement in the offense that he pleaded guilty to.

## V. EXHIBITS IN AID OF SENTENCING

Attached hereto, please find a list of the following exhibits in support of Mr. Dillard's arguments in mitigation of sentence:

**A.** Letter from Brandon Kelly Dillard;

**B.** Letter from Susan Schneider, Mr. Dillard's mother, dated February 20, 2024;

**C.** Letter from Ronda Mettler, Mr. Dillard's girlfriend's mother, dated February 29, 2024;

**D.** Letter from Blaize Mettler, Mr. Dillard's girlfriend, dated March 20, 2024;

**E.** Pastor Jeff Stackhouse of Trinity Reformed Church, Mr. Dillard's longtime friend, dated February 5, 2024;

**F.** Kari Bagnall, Founder and Executive of Jungle Friends Primate Sanctuary where Mr. Dillard volunteers and longtime friend;

**G.** Sandra Vescio, President of St. Jude's Women's Auxiliary where Mr. Dillard is a trustee and longtime friend, dated February 22, 2024;

**H.** Letter from Zachary Terry, Mr. Dillard's longtime friend, dated February 10, 2024;

**I.** Letter from Nichalas Sakowski, Mr. Dillard's family friend, dated January 28, 2024; and

**J.** Certificate of Completion awarded to Brandon Dillard from New Beginning Recovery Group for strong compliance throughout the program, dated September 21, 2023.

## VI. CONCLUSION

Mr. Dillard has been, is, and will forever be deeply remorseful for his actions on January 6, 2021. Although he never intended to go to the Capitol that day, he ended up participating in the most shameful chapter of recent American history. Since that day, he has tried to make amends for his actions. He took responsibility for entering the Capitol through a broken window. He acknowledges that he made a mistake contacting a police officer despite the best of intentions. Throughout his time at the Capitol, Mr. Dillard never acted with the seditious intent that have marked the most notorious

/// /// ///

/// /// ///

Capitol riot cases. He has also demonstrated a level of contrition that many Capitol riot defendants never even approach. He respectfully requests a sentence of credit for time served followed by a term of supervised release.

DATED: April 1, 2024.

Respectfully submitted,

By: */s/ Yi Lin Zheng*
Yi Lin Zheng
Vegas Golden Law
Attorney for Brandon Kelly Dillard

### CERTIFICATE OF ELECTRONIC SERVICE

The undersigned hereby certifies that she is an employee of the Vegas Golden Law and is a person of such age and discretion as to be competent to serve papers.

That on April 1, 2024, she served an electronic copy of this **SENTENCING MEMORANDUM** by electronic service (ECF) to the persons named below:

Samantha Miller
Assistant United States Attorney
601 D Street NW
Washington DC, 20004

*/s/ Yi Lin Zheng*
An Employee of Vegas Golden Law