**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | : | |
| **UNITED STATES OF AMERICA** | : | **Case No.: 23-cr-76 (CRC)** |
| | : | |
| **v.** | : | |
| | : | |
| **BRANDON KELLY DILLARD,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that the Court sentence Defendant Brandon Kelly Dillard to 8 months' incarceration, one year of supervised release, 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution. Dillard's sentencing guidelines range is 8 to 12 months' incarceration, and the government's requested sentence falls at the low end of that range.

**I.     Introduction**

Defendant Brandon Kelly Dillard, who is 40 years old and co-owns and runs a small business with his mother, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol Building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and

Dillard pleaded guilty to a violation of 18 U.S.C. § 1752(a)(2), engaging in disorderly or disruptive conduct in, or in proximity to, a restricted building or grounds. The government's recommendation is supported by Dillard's (1) aggressive and threatening conduct toward officers at a protest he attended on January 5, 2021, (2) scaling of a wall of the Capitol to attempt to unlawfully enter the building on January 6, 2021, (3) unlawful entry through a broken exterior window of a Senate conference room, (4) extended presence, of nearly an hour, in the center of a mob of rioters who were the most violent assailants of officers at the Lower West Tunnel, and (5) physical contact with an MPD officer who was pulled into the crowd of rioters and assaulted as he appeared to be hyperventilating and losing consciousness.

The Court must also consider that Dillard's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Dillard's crime support a sentence of 8 months' imprisonment in this case.

## II.     Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 28 ¶¶ 1-7 (Statement of Offense).

---

is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

***Defendant Dillard's Pre-January 6 Conduct***

Defendant Brandon Kelly Dillard, who lives in Las Vegas, Nevada, flew with his girlfriend from Las Vegas to Dulles International Airport in Northern Virginia on January 5, 2021. Their trip was intended to be a vacation, which included a plan to attend former President Trump's rally on January 6, 2021, and do some other sightseeing in the city.[2] Leading up to January 6, Dillard had become more interested and involved in politics; thus, as he planned his D.C. trip for January 6, he understood that the Electoral College Vote Certification was going to be taking place on that day inside the Capitol Building, and he understood that Vice President Michael Pence would be overseeing and certifying the vote. *See* Debrief.

After arriving in the D.C. area, during the evening of January 5, 2021, Dillard attended protests in downtown Washington, D.C. That night, MPD officers formed lines to control the crowd and prevent protestors from entering certain restricted areas, including Black Lives Matter Plaza and Lafayette Square, near the White House. Dillard was recorded as he stood at the front of a group of demonstrators near Black Lives Matter Plaza where he confronted lines of officers, pointing at them. Dillard encouraged the crowd to advance toward and overrun the police line that was protecting the Plaza by shouting, "forward!"

---

[2] Certain factual information herein was obtained during the parties' February 28, 2024 debrief, which was required pursuant to paragraph 2 of Dillard's plea agreement, "Cooperation with Additional Investigation." *See* ECF 27 at 2. Information obtained from that debrief is indicated herein by citation to the "Debrief."

3



*Image 1: Ex. 1 - Dillard encouraging individuals to proceed "forward" through a line of uniformed officers protecting Black Lives Matter Plaza (Timecode 00:59).*



*Image 2: Ex. 2 - Dillard (circled in yellow) taunting uniformed police officers on January 5, 2021 (Timecode: 0:52).*

### *Defendant Dillard's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Dillard and his girlfriend attended the former President's rally near the Ellipse, where they listened to the former President's speech. *See* Debrief. In fact, after the former President began speaking, Dillard noticed some available seating close to the stage, where he and his girlfriend were able to find a seat and listen to the remainder of Trump's speech. *Id.* A number of times during that speech, President Trump referred to Vice President Michael Pence's role in the Electoral College Certification that day, including as follows:

Mike Pence, I hope Mike is going to do the right thing. I hope so. I hope so. Because if Mike Pence does the right thing, we win the election . . . .

. . .

By the way, Pennsylvania has now seen all of this. . . . And they want to recertify their votes. They want to recertify. But the only way that can happen is if Mike Pence agrees to send it back. Mike Pence has to agree to send it back.

. . .

Mike Pence, I hope you're going to stand up for the good of our Constitution and for the good of our country. And if you're not, I'm going to be very disappointed in you. I will tell you right now. I'm not hearing good stories.[3]



*Image 3: Ex. 3 - Dillard (circled in yellow) attending rally at the Ellipse on January 6, 2021 (Timecode 00:09).*

After President Trump's speech ended, Dillard and his girlfriend gathered their belongs and grabbed lunch. *See* Debrief. Eventually, they made their way onto Capitol grounds, which was a restricted area, and participated in the riot at the United States Capitol Building. *See id.*[4] Recognizing the dangerousness of the mob, Dillard instructed his girlfriend to stay behind on the

---

[3] *See* https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[4] Dillard's girlfriend has not been charged with any crimes arising from the events of January 6, 2021.

West Plaza, the lower level of the restricted area. *See id*. Dillard, however, made his way up the east stairs to what is known as the Capitol's Upper West Terrace, closer to the Capitol Building. *See id*.

Despite seeing the thousands of rioters below him, who had been visibly battling the outnumbered police force for nearly two hours already, Dillard then chose to descend the wall to get into the action. Wearing a distinctive spiderweb-patterned hooded sweatshirt, black knit hat, and a black paisley print neck gaiter, Dillard scaled down the Capitol's exterior wall at around 4:16 p.m.  He climbed over the railing of the Upper West Terrace and climbed down the wall to the ledge of the window frame of a Senate conference room, Senate Terrace Mezzanine Room 2 ("Room ST-2M"). Room ST-2M is immediately to the north of a tunnel entrance to the U.S. Capitol Building, known as the "Lower West Tunnel."





*Images 4 and 5: Ex. 4 - Dillard (circled in yellow) scaling wall of Capitol Building (Timecode 00:45 – 1:26).*

Once Dillard climbed down to the bottom ledge of the window frame of Room ST-2M, he crouched down and looked into a portion of the window that – just a few minutes before – had been smashed in, shattered, and hollowed out by other rioters. He climbed through the hollowed-out window and unlawfully entered the U.S. Capitol Building. Dillard was one of the first individuals to enter Room ST-2M of the Capitol Building.



*Image 6: Ex. 5 - Dillard (circled in yellow) climbing into ST-2M (Timecode 0:08).*

About 30 seconds later, Dillard crawled back out of the window and onto the staging area that was set up for the presidential inauguration. Once outside, Dillard pulled down his face mask, exposing more of his face.



*Image 7: Ex. 6 - Dillard (circled in yellow), after exiting Room ST-2M (Timecode 0:59).*

8

At the time Dillard descended the wall to the window frame of Room ST-2M, during his presence inside Room ST-2M, and while he remained on the staging area, he was just feet away from the entrance of the Lower West Tunnel, where a prolonged, violent attack by rioters against police was underway. During that attack, rioters damaged nearby rooms of the building, including Room ST-2M, and retrieved items from those rooms, including furniture and doors, which they then used to physically assault the law enforcement officers that were protecting the Tunnel. Dillard was in the immediate vicinity of this violence and observed it as it was happening.



*Image 8: Ex. 7 - Dillard (circled in yellow) near the Tunnel entrance (Lev Radin Photo).*

At approximately 4:28 p.m., MPD Officer B.M., who was at the front of a line of uniformed officers defending the Tunnel, was dragged into the crowd and assaulted by rioters. At or near the time of the assaults on Officer B.M., Dillard was nearby. As Officer B.M. appeared to be hyperventilating and losing consciousness, a group of rioters formed around him, which Dillard

chose to join. Rather than walk away and give the Officer B.M. space to breathe, Dillard instead repeatedly grabbed at Officer B.M.'s helmet and attempted to remove it, thus making physical contact with Officer B.M. Due to the gas mask Officer B.M. was wearing underneath the helmet, rioters' attempts to remove the helmet, including Dillard's, resulted in the helmet strap choking Officer B.M.

Notably, the video evidence shows that when Dillard initially observed Officer B.M. struggling and attempted to intervene, Dillard's neck gaiter is below his chin, revealing his face. Although Dillard purports to be attempting to assist Officer B.M., he nonetheless takes the time to, in the middle of the interaction, pause to pull his neck gaiter back up over his face, presumably to shield his identity.





*Images 9, 10, 11: Exs. 8, 9 - Dillard moving towards and later grabbing Officer B.M.'s helmet*
*(Officer B.M. circled in blue, Dillard circled in yellow)*
(Ex. 8 timecode 1:34 – 2:22; Ex. 9 timecode 4:50 – 4:59).

Dillard remained near the inaugural stage area of the Lower West Terrace until at least

5:06 p.m. as the rioters continued overwhelming officers and attempting entry into the Capitol

building. Around that time, Dillard believed the National Guard had been called in to assist the

heavily outnumbered, beleaguered local police; once the Guard arrived, Dillard experienced

something that felt like tear gas, which he understood was deployed to attempt to contain the still-violent mob. *See* Debrief.

It was only after the gas was deployed that Dillard attempted to exit Capitol grounds, after he had remained near the center of a group of the most violent assailants that day, observing their attacks for almost an hour.



*Image 11: Ex. 10 - Dillard* walking past an officer as law enf.orcement regains control of the LWT.

### The Charges and Plea Agreement

On March 9, 2023, the United States charged Dillard by a four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2), and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On November 7, 2023, pursuant to a plea agreement, Dillard pleaded guilty to Count Two of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building or Grounds. ECF 27. The plea agreement provided that the government reserved the right to argue that a three-point Guidelines enhancement for physical contact with an officer should apply. *Id.* at 3. By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol. *Id.* at 8.

*Dillard's Debrief Interview*

On February 28, 2024, Dillard was interviewed by the FBI in a debrief session pursuant to paragraph 2 of Dillard's plea agreement, "Cooperation with Additional Investigation." *See* ECF 27 at 27. In the interview, Dillard was largely forthcoming with respect to many details of his day on January 6, but he also minimized and provided non-credible explanations for certain of his actions.

The government found the following to be forthcoming and credible from Dillard's debrief: Once he and his girlfriend got to the rally at the Ellipses, they saw and heard approximately 45 minutes of then-President Trump's speech. Then, after grabbing lunch and moving their car closer, they made their way to the Capitol, where they heard people planning to "rally." Upon crossing into the restricted area of the Capitol, where he observed the massive number of violent rioters on the west front, Dillard instructed his girlfriend to stay behind on the inaugural staging area while he, instead, ascended the steps underneath the scaffolding on the east side of the plaza to get to the Upper West Terrace. After remaining on the Upper West Terrace for approximately 15 minutes, Dillard then chose to scale down the Capitol's wall to just above the arch of the Lower West Tunnel.

From the window ledge where he landed, he then crawled into Room ST-2M through the shattered window, but turned around quickly afterwards, once he observed other rioters inside the room who were stating that they planned to break down doors to stop the Electoral College Vote count. Dillard believed that trying to stop the certification was not going to change the outcome and was "the worst thing they could have done." Prior to and on January 6, 2021, Dillard knew and understood that the Electoral College Vote process was taking place inside the Capitol on that day, and that Vice President Michael Pence was in charge of that process. Approximately 20

minutes after exiting Room ST-2M, Dillard then participated in the incident with Officer B.M. Dillard stated that he could tell that Officer B.M. could not breathe and contended that he was attempting to help the officer. Dillard admitted and expressed regret for his conduct on January 6. He admitted that, in hindsight, he should have left when he observed violence.

However, the government found the following to be less forthcoming and less credible from Dillard's debrief: When asked about his conduct in D.C. on the evening of January 5, 2021 at the rally near Black Lives Matter Plaza and Lafayette Square, Dillard minimized the violence going on around him at the event, and the fact that his own actions—pointing a finger in the face of the police and yelling at them—potentially incited that violence. He instead explained his hour-long participation in that January 5, 2021 event as follows: "there was a lot of emotion going back and forth" between both sides, but he saw "no real confrontations." With respect to January 6, 2021, although he candidly acknowledged many of his actions were "stupid" on that day, he attributed his "stupid" decision-making to his impulsive nature, "ADHD," and that he had failed to take his medication on January 6. Furthermore, Dillard incredibly explained that he chose to scale the walls of the Capitol Building because he was unable to otherwise exit. As this Court knows, ample footage from January 6 exists where rioters chose to, and did, leave the Upper West Terrace by either turning around and going back down the stairs from which they came, or by finding alternate paths, such as the walkway from the south side of the Upper West Terrace.

### III.    Statutory Penalties

Dillard now faces sentencing for violating 18 U.S.C. § 1752(a)(2). As noted by the plea agreement and the U.S. Probation Office, Dillard faces up to one year of imprisonment, a term of supervised release of not more than one year, and a fine of up to $100,000. He also must pay

restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. ECF 32. According to the PSR, the U.S. Probation Office calculated Dillard's adjusted offense level under the Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.4) | 10 |
| Specific Offense Characteristic (U.S.S.G. § 2A2.4(b)(1)(A)) | +3 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| **Total Adjusted Offense Level** | **11** |

*See* PSR at ¶¶ 29-37.[5]

Recent amendments to the Sentencing Guidelines include a new guideline, U.S.S.G.

---

[5] Although Dillard argues in his sentencing memorandum against a three-level increase for physical contact with an officer (*see, e.g.,* ECF 34 at 4), such a position directly contradicts the facts to which Dillard admitted in his Statement of Offense, where Dillard admitted that he "repeatedly grabbed Officer B.M.'s helmet, *making physical contact with Officer B.M.* in an attempt to remove Officer B.M.'s helmet." ECF 29 ¶ 14 (emphasis added). Therefore, the enhancement applies.

§ 4C1.1, which provides for a two-level decrease in the offense level for individuals who have no criminal history points and who meet certain additional criteria. Section 4C1.1 will be in effect at the time of sentencing in this matter, but was not considered at the time the parties entered into the plea agreement. The government agrees with Probation's conclusion that Dillard is not eligible for the § 4C1.1 reduction because he "used violence or credible threats of violence in connection with the offense." PSR ¶ 36; *see* U.S.S.G. § 4C1.1(3).

"Neither § 4C1.1 nor other provisions in the Guidelines define the terms 'use violence' or 'use . . . credible threats of violence[, a]nd the D.C. Circuit has not interpreted these terms as used here." *United States v. Yang*, No. 23-cr-100 (JDB), 2024 WL 519962, at *3 (D.D.C. Feb. 9, 2024). Accordingly, judges in this District have looked to the plain meaning of the terms at the time of enactment in order to determine whether the limitation of § 4C1.1(3) applies. *Id.* at *3-*4; *see also United States v. Bauer*, No. 1:21-cr-386-2 (TNM), 2024 WL 324234, at *3 (D.D.C. Jan. 29, 2024). As Judge Bates recently explained,

> Contemporary dictionaries define "violence" as "the use of physical force, usually accompanied by fury, vehemence, or outrage; especially, physical force unlawfully exercised with the intent to harm," or as "the use of physical force so as to injure, abuse, damage, or destroy," . . . . These definitions draw additional support from case law interpreting "violence" in similar contexts.

*Yang*, 2024 WL 519962, at *4 (cleaned up) (citations omitted). This Court has concluded that the government must establish that the defendant personally "used violence or credible threats of violence" on January 6, 2021, to bar the two-level downward adjustment of § 4C1.1(3). *United States v. Strand*, No. 1:21-cr-85 (CRC), ECF No. 150 at 4 (citations omitted).

Here, Dillard engaged in and threatened violence when he repeatedly grabbed and attempted to remove Officer B.M.'s helmet. Video of the incident shows that Officer B.M. appeared to be hyperventilating and losing consciousness. Rather than give Officer B.M. space to breathe, Dillard joined the crowd surrounding him, and choked Officer B.M. with the helmet strap

(because the helmet was attached by a strap underneath Officer B.M.'s chin). During the interaction, Dillard also paused to ensure his neck gaiter was covering his face, presumably to shield his identity. Thus, Dillard's intent to "injure, abuse, damage, or destroy" is established by a preponderance of the evidence, particularly in light of the fact that Dillard deliberately remained in or near the center of the most violent assailants that day, observing their attacks near the Lower West Tunnel for almost an hour. Therefore, Dillard's conduct was unlike that of Tyng Jing Yang, who, the Court determined, did not use violence or credibly threaten of violence because "[t]he two instances in which he made physical contact with officers were brief and reactive" and his body language was "overtly nonconfrontational, with his hands raised in the air." *Yang*, 2024 WL 519962 at *4. Even if Dillard's initial intent was to assist the officer, one cannot ignore the violent conduct and context in which this defendant participated. The defendant intended to commit disorderly conduct on Congressional grounds, as the plea explains, and understood the implications of his actions that day. Surrounding a fallen officer in this manner is objectively both threatening and violent.

The U.S. Probation Office correctly calculated Dillard's criminal history as a Category I. PSR at ¶ 43. Accordingly, Dillard's total adjusted offense level, after acceptance, is 11, and his corresponding Guidelines imprisonment range is 8 to 12 months (taking into consideration the statutory maximum sentence, *see* U.S.S.G. § 5G1.1(c)(1)). PSR at ¶¶ 90-91. Dillard's plea agreement contains an agreed-upon Guidelines' calculation that mirrors Probation's calculation.[6]

Regardless of the applicability of § 4C1.1, the government's 8-month recommendation is

---

[6] The government also notes that although Dillard argues for "time served" throughout his sentencing memorandum (*see, e.g.,* ECF 34 at 11), he has not "served" any "time" in this matter, other than when he was detained over a weekend post-arrest because he missed the United States Marshals' cutoff time for release in his local jurisdiction.

a within-Guidelines sentence. That is, if § 4C1.1 applies, Dillard's adjusted Guideline range would be 4 to 10 months, and a sentence near the top of that range would be appropriate given the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history. Accordingly, to avoid unnecessary litigation, if the Court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it still would have imposed the same sentence.[7]

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of individuals with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of imprisonment of 8 months.

### A.  The Nature and Circumstances of the Offense

---

[7] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n.10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate, notwithstanding Application Note 10 to § 5C1.1.

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Dillard's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Dillard, the absence of additional criminal acts is not a mitigating factor. Had Dillard engaged in such conduct, he would have faced additional criminal charges.

The manner in which Dillard conducted himself before and during the January 6, 2021, riot sets him apart from many other misdemeanor defendants. Dillard was at the front line of demonstrators who heckled officers protecting restricted areas during the evening of January 5, 2021, jeering the officers and encouraging others to overrun the police line. Then, less than a day later, Dillard again placed himself in the center of the violent conflict between rioters and MPD officers in the Tunnel area of the Lower West Terrace, where he remained not briefly, but for almost an hour.

More specifically, Dillard's conduct is noteworthy for two main reasons. Leading up to January 6, 2021, Dillard understood what the Electoral College Vote Certification was, and that it was going to be taking place inside the Capitol Building on that day. He therefore understood that Vice President Michael Pence, and Congressmen and women and their staff, were inside the building. In addition, as he stood on the Capitol's Upper West Terrace, he could see the many thousands of rioters beneath him, some of whom were already battling the police at the Lower West Tunnel. He admitted in his debrief that he definitely could see "violence going on" during

his presence there. Nonetheless, he then—as a nearly 40-year-old adult man—chose to climb over the railing on the Upper West Terrace, and scale down the wall directly above the very area where the most violent attack on the Capitol was under way. Dillard apparently was looking for any way to enter the Capitol Building and eventually did so, crawling through broken glass to enter a Senate conference room soon after it had been breached. Dillard's desire to be a part of the action below, and his decision to scale the wall and crawl through the smashed window of a sacrosanct building on an important, historic day, shows a serious disrespect for the building itself, and for the principle for which it stands: freedom and democracy. For these initial reasons, Dillard's conduct is noteworthy.

Second, at approximately 4:28 p.m., MPD Officer B.M., who was at the front of a line of uniformed officers defending the Tunnel, was dragged into the crowd by rioters and viciously assaulted. As Officer B.M. appeared to be hyperventilating, a group of rioters formed around him. Dillard chose to join that mob. Rather than walk away and give Officer B.M. space to breathe, Dillard instead repeatedly grabbed Officer B.M.'s helmet, making physical contact with Officer B.M., and allowing the helmet's strap to choke the officer. Regardless of whether Dillard intended to help or hurt the officer, his actions contributed to the cacophony of the day, and implicated the health of an officer. In all, Dillard was present on the Lower West Terrace for nearly an hour before he experienced the effects of a gas that eventually drove him and the other rioters away. For these additional reasons, Dillard's conduct is noteworthy for a misdemeanor defendant.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

**B.  Dillard's History and Characteristics**

While Dillard lacks any countable criminal history prior to the instant offenses, the seriousness of his conduct on January 6 and, in particular, his attempts to obstruct officers and his choice to initiate physical contact with Officer B.M. weighs heavily in favor of incarceration. Notably, Dillard's father worked in law enforcement for much of Dillard's life. Although Dillard may argue that his familial ties to law enforcement informed his decision to attempt to aid Officer B.M. in the incident discussed above, the government respectfully submits that this fact cuts the other way: had he wished to, Dillard could have shown his sympathy with the officers and assisted those officers by taking a leadership role in attempting to rally the mob around him to exit the premises. He did not. Instead, he sat back and watched the most violent attacks on law enforcement for nearly an hour.

Additionally, this is not the defendant's first introduction to the criminal justice system. In the 15 years between age 22 and age 37, his age on January 6, 2021, Dillard was convicted and sentenced multiple times for multiple crimes, including as follows: (1) received a 120 day-sentence for possession of marijuana and a narcotic controlled substance in 2004; (2) received a 180 day-sentence for possession of a controlled substance in 2008 (for which his probation was revoked six months after conviction because he was charged with additional drug-related crimes, one of which he pleaded guilty to – possession of a controlled substance without prescription); and (3) pleaded guilty to driving under the influence of a controlled substance in 2009.  *See* PSR ¶¶ 39-48. Thus, although Dillard has no criminal history points, unlike many January 6 defendants, he does have a criminal history.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol Building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to Dillard also weighs heavily in favor of an 8-month term of imprisonment, lest he conclude that participation in a riot, scaling government buildings, unlawfully entering the Capitol through a broken window, and repeatedly grabbing the helmet of an officer under siege are valid ways to exercise his "political passion." PSR ¶ 53. Dillard's conduct on January 5 and 6 demonstrated his willingness to interfere with police officers as they attempted to protect restricted areas. When he observed violence, he chose to remain and, in fact, moved closer. The Court must sentence Dillard in a manner sufficient to deter him specifically, and others generally, from expressing political passion as part of a violent mob.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[8] This Court must sentence Dillard based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Dillard has pleaded guilty to Count Two of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building or Grounds. This offense is a Class A misdemeanor, *see* 18 U.S.C. § 3559, for which the Sentencing Guidelines must be calculated and considered. As always, the sentencing factors set forth in 18 U.S.C. § 3553(a),

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), must be applied.

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Three cases involving individuals who pleaded guilty to 18 U.S.C. § 1752(a)(2), made physical contact with uniformed officers on January 6, 2021, and faced identical Guidelines ranges are instructive. In *United States v. Harris*, No. 1:21-cr-274 (RDM), Johnny Leroy Harris was present and heckled officers at the same January 5, 2021, demonstration as Dillard. Harris also entered the Capitol Building on January 6, and briefly pushed an officer in the Rotunda as he retrieved his dropped cell phone. Harris had a Criminal History Category of I and Probation, the government, and Harris all agreed to the same Guidelines calculations at issue here; that is, a base offense level under U.S.S.G. § 2A2.4(a), an adjustment for physical contact with an officer under U.S.S.G. § 2A2.4(b)(1)(A), and credit for acceptance of responsibility, resulting in an adjusted offense level of 11. There, based on the conduct described above, Harris's extensive (non-countable) criminal history, the length of time that Harris was inside the Capitol, and his statements on social media, the United States recommended 12 months' imprisonment. The Court sentenced Harris to 7 months' incarceration and 12 months of supervised release.

The case of *United States v. Cramer*, No. 1:22-cr-339 (RDM) also is similar to that of Dillard. Like Dillard, Eric Cramer pleaded guilty to Disorderly and Disruptive Conduct in a Restricted Building or Grounds, received a three-point adjustment under § 2A2.4(b)(1) for making

physical contact with officers, and had a Criminal History Category of I. Cramer, the United States, and Probation all estimated the same Guideline range (8 to 12 months) as here. Cramer caught a police officer's baton in his hand on the Lower West Terrace, pushed an officer in the Rotunda, and actively resisted officers' efforts to remove him from that area. Cramer bragged about his experience on social media afterwards and posted an image of a police baton he took home as a "trophy." There, the United States sought a mid-range sentence of 10 months of incarceration. Judge Moss imposed a sentence of 8 months of incarceration and 12 months of supervised release.

The Court also may wish to consider *United States v. Simon*, No. 1:21-cr-346 (BAH), in which the defendant pleaded guilty to 18 U.S.C. § 1752(a)(2). Glen Mitchell Simon planned for violence at the Capitol by wearing a plated vest to January 6. He, too, went inside the Capitol and made physical contact with officers by pushing a bicycle rack against a police line. After the riot, Simon celebrated his actions at the Capitol and was untruthful in an interview with the FBI. Like Dillard, Simon had no countable criminal history and faced a Guidelines range of 8 to 12 months. There, the government sought a slightly higher sentence of 10 months. Judge Howell sentenced the defendant 8 months of incarceration, a $1,000 fine, and 12 months of supervised release.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence

differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[9] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Dillard must pay $500 in restitution, which reflects in part the role Dillard played in the riot on January 6.[10] Plea Agreement at ¶ 15. As the plea agreement

---

[9] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[10] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 7, 2023. *Id.* Dillard's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 112.

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 8 months' incarceration, one year of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Dillard's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

<div style="margin-left: 40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    s/ *Jordan A. Konig*
JORDAN A. KONIG
Supervisory Trial Attorney, Tax Division,
U.S. Department of Justice
Detailed to the U.S. Attorney's Office
For the District of Columbia
P.O. Box 55, Washington, D.C. 20044
202-305-7917 (v) / 202-514-5238 (f)
Jordan.A.Konig@usdoj.gov

SAMANTHA R. MILLER
Assistant United States Attorney
New York Bar No. 5342175
United States Attorney's Office
For the District of Columbia
601 D Street, NW 20530

</div>

Samantha.Miller@usdoj.gov